Deirdre Lynn HURD, as Personal Representative of the Estate of Bobby Lee Hurd, Jr., deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mary E. Moore Cornett, as Personal Representative of the Estate of Michael Paul Cornett, deceased, Plaintiff,

v.

United States of America, Defendant.

Mary E. Moore Cornett, as Personal Representative of the Estate of Michael Wayne Cornett, deceased, Plaintiff,

v.

United States of America, Defendant.

Mary E. Moore Cornett, as Personal Representative of the Estate of James Daniel Cornett, deceased, Plaintiff,

v.

United States of America, Defendant.

Nos. CIV. A. 2:99–0240–18, CIV. A. 2:99–0241–18, CIV. A. 2:99–0242–18, CIV. A. 2:99–0243–18.

United States District Court,
D. South Carolina,
Charleston Division.

March 8, 2001.

Gedney M. House, III, Charleston, SC, Dennis J. Rhoad, Charleston, SC, for plaintiff.

John K. Douglas, US Attorneys Off., Charleston, SC, Debra J. Kossow, Scatt Memmott, Dept. of Justice, Washington, DC, for defendant.

## OPINION

NORTON, District Judge.

## I. BACKGROUND

The United States Code provides that "[i]n order to render aid to distressed persons, vessels, and aircraft on and under the high seas and on and under the waters over which the United States has jurisdiction ..., the Coast Guard may: (1) perform any and all acts necessary to rescue and aid persons and protect and save property." 14 U.S.C. § 88(a)(1). These tragic cases arise out of a distress call received by the United States Coast Guard in late December 1997.[1]

On December 26, 1997, forty-nine year old Michael Wayne Cornett, an accomplished sailor,[2] and his two sons, sixteen-year old Michael Paul Cornett and thirteen-year old James Daniel Cornett, drove from Hiltons, Virginia to the Light Keeper's Marina in Little River, South Carolina to pick up the Sailing Vessel *Morning Dew* ("S/V *Morning Dew*"), a thirty-four-foot sailboat purchased by the family one month earlier. (Defendant's Exhibit 3, Tr. at 75–76) A fourteen-year old cousin, Bobby Lee Hurd, Jr., from Mountain City, Tennessee, accompanied the Cornetts on this trip. Michael Wayne Cornett intended to sail the S/V *Morning Dew* from Little River, South Carolina to Jacksonville, Florida along the Intracoastal Waterway ("ICW"). (Tr. at 65, 134, 137)

---

1. As this court noted in its initial hearing in this case, the undersigned's father is a 1942 graduate of the United States Coast Guard Academy who is presently planning to attend his 60th class reunion next year. The undersigned was a Coast Guard "brat," who was stationed in Washington, D.C.; San Francisco, California; Yarmouth, Maine; and Chicago, Illinois, until his father left the Coast Guard in 1954. The Findings in this Order are not intended to denigrate, nor should be taken by anyone as denigrating the invaluable services rendered to this country on a daily basis by the men and women of the Coast Guard, including those involved in this case.

2. Michael Wayne Cornett had over twenty years of sailing experience prior to his demise. (Plaintiffs' Exhibit 3 at 3) Moreover, he lived on several sailboats in Florida prior to his children being born. (Tr. at 46) The Cornetts spent considerable time sailing as a family. (Tr. at 46, 59) In addition to owning sailboats, they chartered boats in the Bahamas and the Florida Keys. (Tr. at 59) The evidence revealed Mr. Cornett had experience sailing on the open ocean.

On December 28, 1997, the S/V *Morning Dew* proceeded from North Myrtle Beach, South Carolina and sailed through Winyah Bay into the open ocean, instead of proceeding on the ICW. (Defendant's Exhibit 3; Plaintiffs' Exhibit 3 (SAR Case Study Report at 5)) The National Weather Service had issued a small craft advisory from Little River Inlet, South Carolina to Savannah, Georgia with winds predicted to exceed twenty-five knots from the east. Seas were predicted to range from five to eight feet. Areas of rain and embedded thunderstorms were expected to reduce visibility below one nautical mile. (Defendant's Exhibit 14, Plaintiffs' Exhibit 3, SAR Report at 3) The actual conditions were observed to be "raining, windy, rough." (Tr. at 316)

At approximately 0217 (2:17 a.m.) on December 29, 1997, the S/V *Morning Dew* allided with the north jetty leading into Charleston Harbor. (Tr. at 147; Peschel Deposition at 82–83; Lee Deposition at 34) All four persons on board the S/V *Morning Dew* drowned at sea. Their personal representatives claim the decedents lost their lives because of the acts and/or omissions of the Coast Guard.[3] There are no eyewitnesses to the accident and no survivors.

Plaintiffs sued Defendant under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. and alternatively as a claim in admiralty with jurisdiction under general maritime law, 28 U.S.C. § 1333 and under the Suits in Admiralty Act, 48 U.S.C. §§ 741–752 and the Public Vessels Acts, 46 U.S.C. §§ 781–790. As discussed below, this court has admiralty jurisdiction over this case. This court has considered the trial testimony, deposition testimony, exhibits, pre- and post-trial memoranda and enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. EVIDENTIARY ISSUES

### A. Admissibility of the National Transportation Safety Board Report

The United States objects to the use of certain testimony of Coast Guard witnesses before the National Transportation Safety Board ("NTSB") on hearsay grounds. This court, however, finds that the testimony of Shelley, Sass, and DaPonte before the NTSB does not constitute hearsay. *See* Fed.R.Evid. 801(d)(2)(A)(C)(D) (Admission of a Party–Opponent).[4] Shelley, Sass, and DaPonte

---

**3.** The Amended Complaints allege that on December 28, 1997, Plaintiffs' decedents were on the S/V *Morning Dew*, which had proceeded from Winyah Bay in the open ocean toward Charleston, South Carolina; that at approximately 0217 hours (2:17 a.m.) on December 29, 1997, the vessel struck the jetties near Charleston and at 0217 hours a "Mayday" call was transmitted from the S/V *Morning Dew* to the Coast Guard station at Charleston; that at 0627 hours (6:27 a.m.) another call was made by the Charleston Pilots' Office to the Coast Guard reporting that a boatswain on the automobile carrier, M/V *Pearl Ace*, heard a cry for help from the water in the vicinity of buoy 22 near Sullivan's Island; that the Coast Guard responded to this call and undertook to render aid to the Plaintiffs' decedents, but did so in a reckless

and wanton manner, and, as a direct and proximate result, Plaintiffs' decedents experienced pain and suffering and their ultimate death. Defendant answered admitting that the S/V *Morning Dew* was proceeding in the open ocean, that at 0217 hours a radio transmission was received and heard and that at 0627 hours a telephone call from the pilot dispatcher was received by the Coast Guard regarding the pilot's communication from the automobile carrier. Defendant denied that it engaged in any undertaking to rescue Plaintiffs' decedents and alleged that Plaintiffs' decedents' negligence and/or that of third persons caused Plaintiffs' decedents deaths.

**4.** A statement does not constitute hearsay when:

testified before the NTSB as agents of the United States Coast Guard. As such, their statements regarding the S/V *Morning Dew* incident do not constitute hearsay. Moreover, the NTSB report itself falls within a hearsay exception, Rule 803(8) (Public Records and Reports). Rule 803(8) provides that the following information shall not be excluded by the hearsay rule:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... or (C) in civil actions and proceedings against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness. ·

Courts have consistently held that the factual portions of a NTSB report are admissible into evidence, while excluding any agency conclusions on the probable cause of the accident. *See Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 848 (10th Cir.1986); *Keen v. Detroit Diesel Allison*, 569 F.2d 547, 549–51 (10th Cir. 1978); *Texasgulf, Inc. v. Colt Electronics Co., Inc.*, 615 F.Supp. 648, 651 (S.D.N.Y. 1984); *Fidelity & Casualty Co. v. Frank*, 227 F.Supp. 948, 949 (D.Conn.1964); *Wenninger v. United States*, 234 F.Supp. 499, 518 (D.Del.1964), *aff'd*, 352·F.2d 523 (3d Cir.1965). Accordingly, the factual por-

tions of the NTSB report, specifically the testimony of Shelley, Sass, and DaPonte, are admissible in this case.

## B. Motion to Take Judicial Notice of the National Search & Rescue Manual

■ Following the trial in this matter, Plaintiffs filed a Motion to Take Judicial Notice of the National Search and Rescue Manual Sections 230, 232, 652, 713, and 714. Rule 201 of the Federal Rules of Evidence mandates that a court must take judicial notice of an adjudicative fact when a party so requests. *See* Fed.R.Evid. 201. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* Finding that these excerpts do not pertain to facts in dispute, namely that the Coast Guard "may" request assistance from third parties during a search and rescue mission, this court grants Plaintiffs' Motion to Take Judicial Notice of these excerpts.

## III. CREDIBILITY

For some reason that is impossible for this court to discern, the Government did not deign to call any live witnesses at the trial of this case. This "tactical decision" (if that is what it was) has forced the court to determine credibility on paper. The Government's failure to present any live witnesses at trial is curious, considering this case was tried in Charleston, South Carolina where many of those involved in this incident were stationed.[5] In deter-

---

(2) The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or ... (C) a statement by a person authorized by the party to make a statement concerning the subject (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

5. The motto of the Coast Guard is *Semper Peritus* ("Always Prepared"). This court can only conclude that the Government's witnesses were not prepared for another public airing of their actions on the day in question and during the subsequent investigation into this matter.

mining the credibility of the Coast Guard witnesses, this court cannot ignore that Lt. Daponte admittedly and intentionally did not tell the truth to state law enforcement authorities investigating the S/V *Morning Dew* incident. (Deposition of Daponte at 46, 48) Daponte testified that he was instructed not to tell the whole truth by his Group Commander and District Office. (Deposition of Daponte at 47) Commander Manson Brown also acknowledged that the Coast Guard intentionally withheld information from state law enforcement agencies investigating the S/V *Morning Dew* incident. (Deposition of Brown at 64, 65, 67, 68, 69, 70)

In addition, this court must take notice of the circumstances surrounding the Coast Guard's visit to Ms. Cornett and the Hurd family on March 17, 1998. It is apparent that CDR Brown,[6] representing the Coast Guard, intended to play the 0218 tape for the Hurds and Ms. Cornett and intentionally misrepresented the purpose for his visit to the families. (Deposition of Brown at 24) It is also clear that CDR Brown had been made aware that the families had legal representation prior to visiting Ms. Cornett and the Hurd family at the Hurd's home, but chose to ignore this fact. (Deposition of Brown at 22, 23, 25, 27) CDR Brown purposefully did not tell the families or their attorneys that he had a tape recording of the 0217 Mayday call or that he was going to play it for them. (Deposition of Brown at 28) It is also clear that the sole purpose of CDR Brown's visit was to play the tape. (Deposition of Brown at 30) The Coast Guard, specifically CDR Brown and Lt. Daponte, knew about the 0217 Mayday call by December 31, 1997. (Deposition of Brown at 42, 43)

CDR Brown told his District Chief of OPS about the Mayday call on December 31, 1997. (Deposition of Brown at 47, 48) Needless to say, the playing of the tape shocked the parents of the dead boys, especially Libby Cornett. The Coast Guard did not disclose the tape to the state investigating agency, the South Carolina Department of Natural Resources, until March 20, 1998. (Plaintiffs' Exhibit 8 at Att. 50) Based on the foregoing, the internal inconsistencies in the testimony of many of the Coast Guard witnesses, and after consideration of the testimony of the Coast Guard witnesses at the NTSB hearing, this court finds that much of the government's case lacks credibility.[7]

## IV. FINDINGS OF FACT

### A. The Intended Voyage

1. Michael Wayne Cornett planned to sail the S/V *Morning Dew* from Little River, South Carolina to Jacksonville, Florida along the ICW. (Tr. at 65, 134, 137) He had no intent to travel on the open ocean. (Tr. at 76, 137)

2. Michael Wayne Cornett was at the helm and the three boys were on the bow when the S/V *Morning Dew* departed the ICW southeast of Georgetown, South Carolina for the open ocean with sails reefed, cruising on engine power. (Plaintiffs' Exhibit 3, SAR Report at 5) The weather was cool and sunny when the S/V *Morning Dew* entered the open ocean. (Plaintiffs' Exhibit 3)

3. Mariners admittedly confuse where the shipping channel and the ICW separate and often miss the ICW and continue into the open ocean. At this junction, a vessel operator can go either to the north

---

6. At the time of this incident, Brown was serving as both Operational and Support Commander of the Coast Guard Group Charleston. (Deposition of Brown at 5)

7. Since the Coast Guard officers admit that they intentionally misled the state authorities investigating this matter, this court can only be skeptical of the testimony of Coast Guard witnesses at the trial of this case.

or south of an island in the midst of where Winyah Bay narrows. One must take the southern branch to be in a position to turn into the narrower ICW. If a vessel operator takes the northern branch, he will miss the ICW. (Deposition of Peschel at 41–42) The S/V *Morning Dew* missed the ICW.

### B. The S/V *Morning Dew* Allides With the North Jetty Leading into Charleston Harbor

4. At some time prior to 0217 (2:17 a.m.), the S/V *Morning Dew* struck the north jetty leading into the Charleston Harbor. (Tr. at 147)

5. More likely than not, when the S/V *Morning Dew* hit the north jetty, Michael Wayne Cornett was thrown overboard. Mr. Cornett was fully clothed when his body was found, while the children were scantily clad. (Defendant's Exhibit 3) Specifically, Bobby Lee was found wearing only blue jeans and socks. (Defendant's Exhibit 3) Daniel was wearing only boxer shorts, while Michael Paul was wearing an improperly secured life jacket, a pullover shirt, and boxer shorts. (Defendant's Exhibit 3) The father, however, had on three shirts, a jacket, a windbreaker, and two pairs of pants. If Mr. Cornett had been aboard the boat with the children after the allision, he would have insisted that the children be fully clothed. (Tr. at 297) Furthermore, two commercial ships passed within approximately 650 yards of the S/V *Morning Dew* between 0217 and 0627. (Tr. at 321, 323) Although the S/V *Morning Dew* was equipped with a strobe light and flares, neither were used to attract the attention of the ships. Mr. Cornett was an experienced mariner. If he had been aboard the S/V *Morning Dew* after the allision, he certainly would have used the strobe light and/or flares to signal for help.

### C. The Mayday Call

6. At 0218 (2:18 a.m.) on December 29, 1997, one of the children on board, James Daniel Cornett, sent a broadcast via channel 16 VHF–FM (156.8 MHz), the international maritime distress and hailing frequency. (Plaintiffs' Exhibit 3) This call stated "Mayd ... Mayday, U.S. Coast Guard, come in." [8] (Defendant's Exhibit 10 at 13)

7. Petty Officer Shelley was the on-duty watchstander at the U.S. Coast Guard Group Charleston, South Carolina Operations Center. Petty Officer Shelley testified that when he heard this call,[9] the only words decipherable were "U.S. Coast Guard, U.S. Coast Guard" from a teenager's voice. (Deposition of Shelley at 74–75) [10]

---

8. Daniel, the youngest person aboard the vessel made the 2:18 a.m. call to the Coast Guard. The boys were not supposed to make radio transmissions to the Coast Guard or other state authorities. (Tr. at 78) The fact that Daniel made the call corroborates the finding that Mr. Cornett was not aboard the S/V *Morning Dew* at this time.

9. Shelley testified that at the time he received the 2:18 a.m. call, he thought it was possibly a hoax. (Deposition of Shelley at 76; Plaintiffs' Exhibit 15) In light of the time Shelley received the call, the weather conditions existing at the time of the call, and the use of the words "Mayd ... Mayday, U.S. Coast Guard, come in," there was little basis for Shelley to have considered the call a hoax.

10. When Shelley later listened to the tape of the call he did hear the word "Mayday." (Deposition of Shelley at 26–27). This court clearly heard the word "Mayday" immediately before the words "U.S. Coast Guard" when the tape was played at trial. It is hard to believe that Shelley heard "U.S. Coast Guard" without hearing "Mayday." As noted above in Section III, this court was not afforded the opportunity to hear Shelley testify, but it did have the opportunity to hear the tape recording of the call. The words "Mayday" and "U.S. Coast Guard" are almost inseparable. It is not credible that Shelley could hear one word without hearing the other.

8. Fifteen seconds after receiving the call, Shelley twice attempted to contact the caller. Approximately four minutes after the first call, the Coast Guard received another call, which was from a similar voice, and Shelley twice more attempted to contact the caller. (Defendant's Exhibit 10 at 13–14) Shelley did not log in either call, (Deposition of Shelley at 35), nor did he notify his supervisor, (Deposition of Shelley at 39), until the afternoon of December 29, 1997. (Deposition of Shelley at 62) Shelley also did not rewind the tape to determine the contents of these calls, although he had the ability to do so. (Deposition of Shelley at 35–39)

### D. The Distress Call

9. At approximately 0627 hours, Gerald Lucas, a Charleston Harbor Pilot, was piloting the M/V *Pearl Ace*, a 617–foot automobile carrier, through the jetties and into Charleston Harbor when a boatswain reported to the onboard pilot that he heard someone in the water scream for help off the starboard side of the M/V *Pearl Ace* near buoy 22. (Plaintiffs' Exhibit 3 at 7 (SAR Report); Deposition of Shelley at 45)

10. Mr. Lucas reported this to the Pilots' Office, which in turn reported it to the Charleston Coast Guard Operations Center at 0627 hours. (Defendant's Exhibit 11) Petty Officer Shelley received the call from the Pilots' Office reporting somebody calling for help in the water at or near buoy 22. The pilot boat advised Shelley that it was going to the area.[11] (Defendant's Exhibit 11; Deposition of Shelley at 47) Buoy 22 is at the entrance of the

11. The following discourse ensued between Shelley and the pilot boat at 6:27 a.m.

[Ringing]

*Shelley:* Coast Guard Communications, this is Petty Officer Shelley speaking.

*Pilot Office:* Hey good morning, this is the Pilot Office.

*Shelley:* Yes.

*Pilot Office:* How are you doing?

*Shelley:* Pretty good, how about yourself?

*Pilot Office:* Ok.

*Pilot Office:* Um, we got a pilot inbound, um on a car carrier and he just passed buoy 22, you know right inside the harbor.

*Shelley:* Uh huh, twenty, uh.

*Pilot Office:* Twenty Two.

*Shelley:* Twenty Two. Ok.

*Pilot Office:* And, uh, the boatswain on ship radioed to the bridge that he heard somebody yelling for help and the pilot boats have gone, the pilot boat was here at the dock, they've gone back out to look around, but the pilot wanted me to call you to let you know what was going on, like I said, we've got the pilot boat out there looking for somebody now.

*Shelley:* They weren't able to talk to them any.

*Pilot:* Well no, it was somebody in the water.

*Shelley:* Oh, somebody in the water.

*Pilot:* Yeah, that's what they think.

*Shelley:* Oh, I see.

*Pilot:* Um, so the pilot boat, they were just getting up here to the dock but they turned around and went back out to 22 to look around, what they're going to find I don't know.

*Shelley:* Ok, how many, which pilot boat went out there?

*Pilot: Carolina,* excuse me, wait a minute. We had problems with the boats last night. *Palmetto State.*

*Shelley: Palmetto State.*

*Pilot Office:* But if I guess once they back to 22, I can call you back and let you know what they see or hear, but I don't even.

*Shelley:* Ok, ok, we'll alert the station and they'll determine if they want to get underway also.

*Pilot Office:* Oh, ok. Well, I can, if you want, I can call you back once they get out there to 22 buoy and see what they find.

*Shelley:* Ok, could you.

*Pilot:* Yeah, Yeah.

*Shelly:* Alright.

*Pilot:* Okidoke.

*Shelley:* Great, what's your name again.

*Pilot:* It's Johnny.

*Shelley:* Ok Johnny.

* * * * at the pilot's office.

*Pilot:* Right.

*Shelley:* Ok.

Alright, thanks.

Thank you.

[Hang up]

harbor. (Defendant's Exhibit 11; Deposition of Shelley at 46) Shelley stated that he would "alert the station" and requested a call back once the pilot boat got to the vicinity. (Deposition of Shelley at 43–47; Transcript of Call at Defendant's Exhibit 11) Shelley then left duty, first advising Petty Officer Hartzog, Shelley's relief, and ODO Sass, who was on duty as the Operations Duty Officer, (Plaintiffs' Exhibit 3 at 7), of the 0627 hour call. (Deposition of Shelley at 49) Shelley did not notify Operations Duty Officer ("ODO") [12] Sass of the 0218 transmission until later that afternoon. (Deposition of Shelley at 62)

11. The transcribed transmission reflects the 0627 call reported a call for help at or near buoy 22 from somebody in the water. (Deposition of Shelley at 45, 64, 65) ODO Sass acknowledged that what was reported in the 0627 call rose to the level of "a confirmed distress call." (Deposition of Sass at 18, 24, 25) After looking at the transcript of this call, ODO Sass also testified that Shelley "accurately communicated" the 0627 call to Sass. (Deposition of Sass at 17) Sass, therefore, knew and perceived that there was a report of someone in the water yelling for help near buoy 22. Because of this, Sass perceived the need for rescue and aid. Shelley's testimony confirms that he "fully" briefed Sass as to the "distress" call, which confirms that Sass also knew that there was a report of somebody in the water. In fact, when Sass called Shelley later in the day after the boys' bodies were found, Sass brought up the fact that the Pilots' Office had reported "they had heard people screaming." Sass could only have learned of this by Shelley having repeated it to him at 0627 because Shelley went home and did not talk to Sass until Sass called Shelley at 1620 (4:20 p.m.). (Deposition of Shelley at 43–44, 49–52, 56–57, 63–65, 67–70, 72–73, 89) (Plaintiffs' Exhibit 4) [13]

12. In his deposition, Sass testified that he was the ODO or Operations Duty Officer. (Deposition of Sass at 7) Other documents filed with this court describe him as the GDO or Group Duty Officer. (Plaintiffs' Exhibit 3 at 2) Since Sass referred to himself as the ODO, this court will also use ODO.

13. The following deposition discourse confirms this factual finding:

Gedney Howe for Plaintiff (Designated as Plaintiff)

Eric J. Shelley (Designated as Shelley)

*Plaintiff:* You reported to ODO Sass?

*Shelley:* Yes.

*Plaintiff:* Alright. Would you expect ODO Sass to respond to those cries for help from someone in the water?

*Shelley:* I wouldn't know what to expect.

*Plaintiff:* What has been your experience?

*Shelley:* Well, we usually dispatch for a distress call. We have never had another call of somebody calling for help in the water before.

*Plaintiff:* Well, that's about as distressful as it gets, isn't it?

*Shelley:* Yeah.

*Plaintiff:* I mean, that's up there past my motor won't work or something like that, isn't it?

*Shelley:* Yes.

*Plaintiff:* Do you know of any circumstance in which the Coast Guard has not immediately responded to a distress call when someone was in threat of death or serious bodily injury?

*Shelley:* Not unless they're preoccupied ...

*Plaintiff:* Do you know of an instance in which there has not been an immediate response? Do you know of any instance in which the Coast Guard has not immediately responded?

*Shelley:* I don't remember any.

*Plaintiff:* Okay. Now, you have given me a list of things that the Coast Guard responds to and they make sense to me, radio checks, all sorts of things?

*Shelley:* Right.

*Plaintiff:* Is the number one priority response to mariners who are confronted with death or serious personal injury?

*Shelley:* Yes.

*Plaintiff:* Alright. And would this call that you communicated to Sass fall into the cate-

12. The call received by Petty Officer Shelley from the Pilots' Office and thereafter repeated to Sass was a distress call. (Shelley's Deposition at 71–73; Lt. Daponte's Deposition at 75) Lt. Daponte, Sass's Command Duty Officer (CDO), acknowledged that the call from the pilot boat was an active distress call received by the Coast Guard and the kind of call to which the Coast Guard responds. (Deposition of Lt. Daponte at 74) Petty Officer Shelley acknowledged that the information he communicated to Sass regarding the information from the pilot boat would fall into the category of the number one priority of the Coast Guard. (Deposition of Shelley at 70) Petty Officer Shelley conceded that this call constituted a distress call. (Deposition of Shelley at 72–73) Lt. Hartzog, who relieved Shelley of his duties at the Coast Guard station on the day of the Cornett/Hurd incident, acknowledged that the Coast Guard would deem this type of call a distress call. (Deposition of Hart-

zog at 25–26) ODO Sass agreed that if someone reported they actually heard voices in the water, this would be a confirmed report of distress and he further acknowledged that on a confirmed report of distress, he would take action, "100% of the time." (Deposition of Sass at 18–19, 24) Admiral Norman Saunders testified that "[i]f we [the Coast Guard] knew there was a person in the water in any season of the year ... it would be our responsibility to respond and we would respond as quickly as we could." (Deposition of Saunders at 21) Commander William Dean Lee also testified, after reading the transcript of the call, that the cries for help at sea under the existing weather conditions would constitute a distress call. ("In my opinion, screams or cries for help at sea in those conditions constitutes distress, but that is my opinion") (Deposition of Lee at 40, 42) Accordingly, this court finds that Sass received and perceived that he had a

gory of the number one priority of the Coast Guard?

*Shelley:* Yes.

*Plaintiff:* The mission, the primary mission of the Coast Guard?

*Shelley:* Yes.

(Deposition of Shelley at 69–70)

&ast; &ast; &ast; &ast; &ast; &ast;

*Plaintiff:* The information you had said that there was somebody at buoy 22 in the water calling for help?

*Shelley:* They thought there was, yes.

*Plaintiff:* It doesn't say that in there? (Referring to the transcript of the 6:27 call)

*Shelley:* Okay.

*Plaintiff:* You keep hedging. Do you want to read it again? That's not what it says.

*Shelley:* No. Well, yeah. I'll look at it again.

*Plaintiff:* Let's look at it again? I don't think it says I think I might have heard. You got me? Or Pedro who speaks broken English reports to me the following. I don't think that's what it says. Boatswain on a ship radioed to the bridge that he heard ...?

*Shelley:* Okay.

*Plaintiff:* Not might have heard, could have heard. Heard. Unlike you, he heard it?

*Shelley:* Okay.

*Plaintiff:* He was listening. You got me. Somebody yelling for help. Right?

*Shelley:* Right.

*Plaintiff:* And this somebody is in the water?

*Shelley:* Right.

*Plaintiff:* Alright. Would that constitute a distress call?

*Shelley:* Yes.

*Plaintiff:* Could it constitute anything other than a distress call?

*Shelley:* No.

*Plaintiff:* Alright. And would have communicated it to ODA Sass as a distress call? You would have communicated it to him as information?

*Shelley:* Yes.

*Plaintiff:* Alright, but you perceived it be a distress call?

confirmed report of distress at approximately 0627 on December 29, 1997.

13. Sass, acting within the course and scope of his duties, responded to the distress call. Sass testified that on a confirmed report of distress he would take action 100 percent of the time. (Deposition of Sass at 19, 22, 23) Taking action included, as part of the Search and Rescue ("SAR") process, gathering additional information. (Deposition of Sass at 20, 60, 61) In this case, gathering information consisted of confirming the location of buoy 22 on the chart in the Operations Center, (Deposition of Sass at 15, 61, 62), gathering information from the pilot boat, accumulating information about weather and tides, and deciding which assets to send. (Deposition of Sass at 20, 22, 25, 26, 40, 59, 60, 62, 63) The Coast Guard utilized this information to evaluate how to respond to

this distress call.[14] (Deposition of Sass at 21, 25, 26, 61–63, 65)

**E. The Search and Rescue Response by the United States Coast Guard**

14. The Coast Guard may initiate an immediate response when a mariner is in danger. Private entities may assist the Coast Guard in Search and Rescue Operations. (Plaintiffs' Exhibit 13, U.S. Coast Guard Addendum to the SAR Manual)[15]

15. Upon being fully briefed on the 0627 call by Shelley, Petty Officer Sass made a decision to render aid to Plaintiffs' decedents and used the pilot boat as a Coast Guard response in this undertaking. This was not an unusual way for the Coast Guard to respond. (Footnote 15, *supra*) Indeed, the testimony of Lt. Daponte was to the effect that Sass deemed the pilot boat's checking out the area "for us" as being a timely and appropriate response.

*Shelley:* Yeah, I guess so.
(Deposition of Shelley at 71–73)

**14.** Lt. Daponte acknowledged that between the time Petty Officer Shelley received the 0627 call and the time the pilot boat called back to report they had not found the people who were calling for help, it was an active distress call within the Coast Guard, under consideration by them. (Deposition of Daponte at 75–77)

**15.** The U.S. Coast Guard Addendum to the National SAR Manual, Section 3.B.5.a. provides that an "immediate response will be initiated, if feasible, to any known situation in which the mariner is in imminent danger. The response may be provided by regular Coast Guard resources, Coast Guard Auxiliary resources, or resources belonging to other federal, private, state, local, or commercial entities. The SMC (SAR Mission Coordinator) may use all sources of assistance in a distress situation without concern for private enterprise" (Plaintiffs' Exhibit 13) Sass confirmed that Coast Guard utilizes the assistance of "civilians all of the time" as part of a SAR Response. (Deposition of Sass at 27–28) Other Coast Guard officers have acknowl-

edged that the Coast Guard has used the assistance and services of the Pilots' Association and other non-Coast Guard boats in the past. (Deposition of Daponte at 49; Deposition of Commander Brown at 41) Admiral Saunders confirmed that the Coast Guard had a long working relationship with pilots in harbors all over the United States. (Deposition of Admiral Saunders at 29) Commander Lee testified that it is not unusual to use non-Coast Guard sources relative to a SAR investigation, and "that Group Charleston and every other Group in the Coast Guard relie[d] extensively on assistance from other agencies routinely." (Deposition of Lee at 44; Plaintiffs' Exhibit 18) Moreover, Whitmarsh Seabrook Smith, III, President of the Charleston Harbor Pilots' Association, testified at trial that the Charleston Pilots have a close working relationship with the Coast Guard, and that the Coast Guard may order vessels while on navigable waters in the United States to operate in a manner directed by the Coast Guard. (Tr. at 336, 338) Mr. Smith also testified that in a distress situation that the Harbor Pilots are obligated to follow the directives of the Coast Guard. (Tr. at 340) Michael Stith, Sullivan's Island Fire Chief, testified that the Coast Guard had regularly

(Deposition of Daponte at 81; Plaintiffs' Exhibit 17, NTSB Report, Unsworn Statement of Daponte at 21) Petty Officer Sass confirmed that if no one else was going to the area, the Coast Guard would have sent a boat to search the area. (Plaintiffs' Exhibit 16, NTSB Report, Unsworn Statement of Sass at 12). He testified "[i]t's what we would have to have done if—there was nobody going." (Plaintiffs' Exhibit 16, NTSB Report, Unsworn Statement of Sass at 12). He also acknowledged that when a pilot boat reports a person yelling for help in the water, a boat, and perhaps a helicopter may be sent. (Deposition of Sass at 57) Sass testified before the NTSB that the pilot boat's rescue capabilities were as sophisticated as the Coast Guard's capabilities. (Plaintiffs' Exhibit 16, NTSB Report at 38) ("Well, as far as—like that, as long as they got a spotlight and they got a pair of eyes, it'd be just as good as one of our boats looking.") Sass further testified that after the pilot boat searched the area that he intended "to take appropriate action from there." (Plaintiffs' Exhibit 18, NTSB Report, Unsworn Statement of Sass at 91) Keeping in mind that Sass was aware of a report of people in the water yelling for help, this clearly indicates that Sass had already decided to render whatever aid was appropriate and was doing so, using the pilot boat as an initial response. The court finds that the Coast Guard responded to the 0627 distress call by using the pilot boat as its initial resource to render

aid to mariners in distress. (Deposition of Lee at 55)

16. Gathering information is part of the SAR process. (Deposition of Sass at 60) A Coast Guard rescue involves more than simply putting a boat in the water. Aiding someone in distress is a continuum: it has a beginning, a middle, and an end. It is an evolving process. The first step is the gathering of information, next the evaluation of information, and finally deciding the most appropriate resources relative to rendering aid. (Deposition of Retired Admiral Saunders at 55–56) [16]

17. Petty Officer Sass received information from the pilot boat as part of the decision making process, which began a SAR response. (Deposition of Commander Lee at 55–60) Sass acknowledged that the pilot boat was on the scene looking and that they were going to call the Coast Guard back with information. He further acknowledged that using the pilot boat to search was an adequate response. (Deposition of Sass at 26–27) Sass testified that when the Coast Guard deploys a boat, the Coast Guard sends out a forty-one foot rescue boat with a search light, radar, and crew. (Deposition of Sass at 40) When comparing a forty-one foot Coast Guard boat and one of the pilot boats, Sass noted that "as long as they got a spotlight and they got a pair of eyes, it'd be just as good as one of our boats looking." (Plaintiffs' Exhibit 16, NTSB Report, Unsworn Statement of Sass at 38) He further noted that the pilot boat knows the harbor "probably better than our guys I'm sure, especially the waters." [17] (Plaintiffs' Exhibit 16,

---

called upon the rescue squad, which is part of his fire department itself, to conduct searches for them. (Tr. at 199–200, 212)

**16.** In its Reply Brief to Plaintiffs' Opposition to the United States's Motion for Summary Judgment, the United States conceded "that a SAR mission may be viewed as a continuum of conduct, beginning with the receipt of information regarding a possible distress situation and ending, potentially, with a successful rescue." (Reply Brief at 7, n. 10)

**17.** Richard Dein, an admitted expert in the area of Coast Guard Search and Rescue, (Deposition of Dein at 4–11 and Exhibit 1—CV), testified as follows:

Q. When did he begin the search?

A. He began the search when he got the report that the pilot vessel was going to the scene to locate, identify the source of the people screaming from the water.

(Deposition of Dein at 69)

Q. —I'm asking you what the beginning was?

Note 17—Continued

A. From my perspective, Sass was part of the SAR system, it was alerted, it was alerted by a very definite report of a distress from a credible source, a professional source, the location was positively identified, and Sass was very much aware of the weather conditions. He had just got on watch within an hour. He had been outside, he saw what the wind and weather were.

In my mind, the SAR system was dutifully notified that something was taking place and Sass relied upon that vessel to identify and offer rescue to whatever source of that cry for help was.

(Deposition of Dein at 70)

Q. You say the case began at 0628. What do you mean by the case?

A. Report of a bona fide distress with a report to the Coast Guard by a credible source from a professional mariner at a centralized position in inclement weather, and it was a report that people were in the water, not a vessel, not a life raft; people were in the water.

(Deposition of Dein at 71)

Q. And what do you mean by response?

A. A vessel is—something is sent to assist; however, response within the Coast Guard is also in the confines of the OPS Center itself does submit assistance reports within the SAR reporting system, an OPS Center can make a response. That's when a case begins, when a response is made.

(Deposition of Dein at 72)

Q. And the response was for the pilots to go the area and see what they could find?

A. Correct.

(Deposition of Dein at 73)

Q. What evidence is there of a case?

A. Well, what we had is the SAR system was alerted, and the purpose of the search and rescue system is to provide assistance to mariners in distress. In my opinion, Sass relied upon the pilot vessel to provide assistance to someone that was in distress following the dictates of the whole search and rescue system.

(Deposition of Dein at 76)

Q. Aside from acknowledging the conversation and waiting for the second call and looking at buoy 22 on a chart, the Coast Guard took no response as a result of the 0628 call; isn't that correct?

A. I disagree.

Q. Okay. And how do you disagree?

A. Sass was under—was aware of the responsibility to provide assistance to mariners in distress, he was doing that, he relied upon the pilot vessel. He indicated that if the pilot vessel wasn't there, he would have used his 41–footer. He indicated in the record that the pilot vessel's capabilities were similar, if not identical, to his 41–footer. He judged it to be an adequate resource for the case demands.

In my mind, he fully understood in his mind that he had a case and he was responding to it as best necessary.

Once the call came in, Sass put on his SAR mission coordinator hat and responded appropriately, in his—in his opinion as he interpreted the distress case.

(Deposition of Dein at 77–78, 80)

Q. What did we do?

A. We relied upon the pilot vessel to ascertain what was the source of the cry for help.

Q. Did we tell anyone indirectly that we were coming to search?

A. In my opinion, yes.

Q. How?

A. By the very nature of reporting it to the Coast Guard, which was in the pilot's opinion that that is the agency responsible for search and rescue, and by calling them, he believed that the Coast Guard would respond to that report of a distress.

The way I interpreted it is that conversation alerted the SAR system that was—in place and waiting to respond to a request for help. That's the whole purpose of the SAR system. The pilot's call triggered the system. The pilots also said, we're sending a vessel to look. In the SAR mission coordinator's eyes, in my opinion, he accepted, he thought, that that resource was adequate for the case demands at the time. He indicated that if that resource did not go, he was prepared to send his own resource. He was—in my opinion, he was relying upon the pilot vessel to identify the source of the cry for help.

(Deposition of Dein at 103–105)

Q. Was there a request for assistance in this case?

A. It was implied.

Q. There was no direct request for assistance?

A. Correct. But that it not untypical on many, many reports to the Coast Guard of a distress. I mean, no one comes and calls the Coast Guard and says, are you coming. It's implied in the reports of a distress to

Note 17—Continued

the—noted to the acknowledged search and rescue authority.

(Deposition of Dein at 106–107) (emphasis added)

Q. Looking at Page 1, you have down here "had back up." What does that refer to?

A. Oh, that's the 41–footer. In—in Sass' mind, he, one—and this goes to my opinion and understanding of why I think the Coast Guard attempted to render aid—is that he considered the capabilities of the pilot vessel, and he does that quite clearly in one of his statements or deposition or whatever, and I wish I could refer them to you specifically, but I can't at the moment.

He considered the capabilities of the pilot vessel. He compared the capabilities to his perception of the case demands. He considered the capabilities to the pilot vessel similar to, almost identical to his 41–footer. In the search and rescue system, the intent is to get the quickest resource on scene that's capable of effecting a rescue. In his mind that was the pilot vessel. And so that is why I believe that Sass relied upon that vessel and that was the Coast Guard response. Even though it was not in white with the blue stripe on it, it was still a response to a distress.

Q. Now, you have "followed response vessel." What does that mean?

A. Oh, he was interested in following—he knew that they were expecting a report, and I believe that he was following—in his mind he was waiting for a report back from the vessel. There's nothing to indicate that Sass was not conscientious necessarily about his job or that he was untrained or unqualified, and if you asked him the question, if you didn't hear from the pilot vessel, would you have made a call to the pilot vessel, I think the answer would be yes.

Q. Is it fair to say that your opinion is that when the call came in, that we under—as I understand what you're saying is that the Coast Guard undertook to render aid by relying on the pilot vessel and that when the pilot vessel—and further that we, you know, had the belief that the pilot vessel was capable and that when—and that it was the closest asset on scene, and that when the pilot vessel called back and said they didn't hear or see anything, that we decided at that point that there was no need to have a—continue the case and then we suspended search?

A. Correct.

Q. And as I recall we were—it's your opinion that we rendered aid and when we received the second call from the pilots, Sass decided to suspend the search?

A. Correct.

(Deposition of Dein at 110–113)

Q. But would Sass' relying on the pilots search, does that rise to the same level of activity as what's involved with the precom?

A. Oh, it exceeds the precom.

Q. Simply receiving the phone call and waiting for the report back?

A. No. A precom and excom is then done prior to the dispatch of a response, a response vessel. This case had already transcended that because the case required that a response be made.

(Deposition of Dein at 118–119)

A. **My opinion is the Coast Guard did attempt to render aid through the [auspices] [sic] of the pilot vessel which was responding to a report of distress, which is what the Coast Guard OP Center was in business to do.**

(Deposition of Dein at 143)

Q. Was a response made?

A. Yes.

Q. And how was a response made?

A. The response was made to the distress using the pilot's vessel to identify and effect a rescue if necessary.

Q. Does the Coast Guard Addendum to SAR provide that response may be made by private entities?

A. Yes it does.

(Deposition of Dein at 144–45)

Q. Did Sass recognize there was a need for response?

A. Yes.

Q. And what was the reason for using the pilot boat, as you understood it?

A. Well, the pilot vessel was—was the closest vessel to the scene of the reported distress. It could get on scene the quickest, and if someone needed immediate help, the pilot vessel could have provided that assistance.

Q. What does Sass say about the pilot boat relative to his 41–foot boat?

A. He felt the pilot—he—Sass made an objective assessment or an affirmative assessment, however you will, that the pilot vessel's capabilities were very similar to his 41–footer in terms of radar, in searchability, and since the pilot vessel was en route, there was no need to send the 41–footer; however, he was prepared so send the 41–footer if the pilot vessel was unable to respond.

NTSB Report, Unsworn Statement of Sass at 38–39)

18. Based on the facts set forth above, I find that the Coast Guard made the decision to and did undertake to render aid to Plaintiffs' decedents at the time of the 0627 call from the harbor pilot.[18]

19. The pilot boat reported to the Coast Guard at 0648 (6:48 a.m.) that the pilot boat did not see anything and did not hear anything after searching the area near buoy 22. (Plaintiffs' Exhibit 1)

20. The sunrise on December 29, 1997, was at 0722 (7:22 a.m.). (Plaintiffs' Exhibit 3 at 3)

### F. ODO Sass Suspends the Search to the Detriment of Bobby Lee Hurd, and Daniel and Paul Cornett

21. Sass, upon receiving the 0648 report that the pilot boat did not find anything, made the decision to suspend the search (Deposition of Dein at 69, 148) and took no further action. (Deposition of Dein at 185; Deposition of Daponte at 82) Sass acknowledged that the information from the pilot boat was information from a "resource in the area," (Deposition of Sass at 64) which he used in his decision making process "with a view toward the prospective rescue." (Deposition of Sass at 63) However, upon receiving the return call stating that the pilot boat had searched the area with negative results, Sass made the decision to do nothing further. Sass, "did not ask any amplifying questions regarding search conditions, area searched, visibility," (Deposition of Sass at 39; Plaintiffs' Exhibit 3 at 7–8), although Sass had the capacity to tell the pilot boat to do so, (Deposition of Sass at 34), and "no vessel was dispatched to double check the area

after sunrise." (Deposition of Sass at 42; Plaintiffs' Exhibit 3 at 8)

22. Based upon the facts of the case, "the search should *not* have been allowed to terminate before first light." (Plaintiffs' Exhibit 3 at 13) Richard Dein testified that Sass's decision to call off the search was unreasonable, and the exercise of no care at all, and that Sass "should have taken the exact opposite action of what he did." He further testified that "the normal progression of events in the SAR system is that you go out and you look for something, if you don't find it, you don't diminish your efforts, you increase the efforts; and he didn't do that." (Deposition of Dein at 148–49, 156) Lt. Daponte acknowledged that what Sass did with regard to the pilot boat's efforts was "inadequate." (Deposition of Daponte at 83)

23. The decision to suspend the search and take no further action constituted a failure on the part of the Coast Guard to exercise any care toward Plaintiffs' decedents. Admiral Peschel, Defendant's Expert Witness, testified that the decision to do no more was the failure to exercise any care for the persons in distress. (Deposition of Peschel at 124) Commander Lee's SAR Case Study summarized, that based on the facts of this case, "the search should *not* have been allowed to terminate before first light." (Plaintiffs' Exhibit 3 at 13)

24. I find that it was completely foreseeable that the failure of Sass to do anything further upon receipt of the 0648 return call would result in injury and/or death to Plaintiffs' decedents. The Coast Guard was aware that a boatswain on the *Pearl Ace* reported hearing someone yell-

---

**18.** The fact that CDR Lee also found that the search should not have been allowed to "terminate" before sunrise further supports the finding that Coast Guard undertook a re- sponse. (Plaintiff's Exhibit 3 at 13) The search and rescue could not "terminate" if it never began.

ing for help in the water and also knew that the pilot boat had searched the area from which the yelling was heard, before daylight, with negative results. The Coast Guard was also aware that someone in the water was in threat of serious bodily injury or death. (Deposition of Sass at 44) This court concludes that any reasonable search would have begun at buoy 22, which is less than 1250 yards from where the boys were found on Sullivan's Island. The search would also have included the south end of Sullivan's Island, the harbor entrance, and the entire length of the north and south jetties. (Plaintiffs' Exhibit 3 at 13) Thus, it is totally foreseeable that the suspension of the search would result in serious bodily injury and/or death to Plaintiffs' decedents.

25. The pilot boat reasonably expected the Coast Guard to send a Coast Guard boat and they discontinued their efforts to the detriment of Bobby Lee Hurd and Daniel and Paul Cornett.[19] The pilot boat's reliance upon the Coast Guard was reasonable. Gerald Lucas, the Charleston Harbor Pilot aboard the *Pearl Ace*, testified at trial that he fully expected a Coast Guard boat to search the area. (Tr. at 319) Whitmarsh Smith, President of the Charleston Harbor Pilots' Association, agreed with Lucas and testified that the pilot boat would have done more if the pilots knew the Coast Guard was not coming. (Tr. at 350)[20]

26. I find that the decision to suspend the search and the concomitant suspension of the search at 0648 was an act or omission but for which Plaintiffs' decedents' injuries and deaths would not have occurred.

## G. The Discovery of Daniel Cornett and Bobby Lee Hurd

27. James Daniel Cornett (hereinafter Daniel) and Bobby Lee Hurd, Jr. (hereinafter Bobby Lee) were alive at the time of allision. They died of drowning and hypothermia, but they could have been saved until at least 1000 hours (10:00 a.m.).[21] (Deposition of Steinman at 48, 53; Deposition of Raney at 7, 12–13; Tr. at 282)

28. At approximately 11:00 a.m. on December 29, 1997, Daniel Cornett and Bobby Lee Hurd were found 100 yards apart and floating in the water just off the beach at Station 12, at Sullivan's Island, South Carolina. (Plaintiffs' Exhibit 8, Att. 11) The horseshoe life ring with *Morning Dew* written on it was found about five feet away from one of the boys. (Tr. at 211)

29. Bobby Lee was probably alive at this time and died only moments before the paramedics arrived at approximately 11:29 a.m. (Deposition of Dr. Raney at 7) At the scene, paramedics intubated Bobby Lee and confirmed placement of the tube with a $CO_2$ detection device and Bobby Lee was producing $CO_2$. (Deposition of Raney at 7, 9)[22] A person does not have $CO_2$ in his lungs unless there is active circulation and cells are actually producing $CO_2$. In other words, unless there is life.

19. At trial, when Lucas was asked why he had his office call the Coast Guard with regard to the report of a cry for help in the water near buoy 22, he answered, "so, they [the Coast Guard] could send somebody out to look." (Tr. at 317)

20. As noted by Commander Brown, in his two years as Group Commander, the Coast Guard had responded to every distress call. (Deposition of Brown at 73)

21. The Government's expert on hypothermia, Dr. Alan Steinman, testified that 10:00 a.m. was the earliest that Bobby Lee Hurd and Daniel Cornett could have died. (Deposition of Steinman at 53)

22. Dr. Raney testified that Bobby Lee had a large percentage of cells in his body producing $CO_2$, and he had active circulation delivering that $CO_2$ to his lungs. (Deposition of Raney at 9)

(Deposition of Raney at 8) Bobby Lee Hurd died as a result of asphyxia due to drowning. (Plaintiffs' Exhibit 12)

30. Similarly, while there were no CO2 readings on Daniel, his EKG readings showed a classic hypothermic reading and indicated that Daniel's life could have been saved as well at 10:00 a.m. (Deposition of Raney at 12) Daniel also died as a result of asphyxia due to drowning. (Plaintiffs' Exhibit 12)

31. Daniel and Bobby Lee must have attempted to swim to nearby Sullivan's Island together, based on the fact that they were 100 yards apart when they were found.

## H. The Coast Guard Finds Michael Paul Cornett

32. Michael Paul Cornett (hereinafter Paul) was alive when the S/V *Morning Dew* hit the north jetty.

33. The Coast Guard located Paul in full rigor mortis one to two miles out at sea on December 29, 1997, at 1257 hours (12:57 p.m.). Paul was wearing an improperly secured life jacket, a pull-over shirt, and boxer shorts when his body was recovered. (Defendant's Exhibit 30 at 46; Plaintiffs' Exhibit 3 at 9)

34. Dr. Sandra Conradi, a forensic pathologist and former Chief Medical Examiner for Charleston County, opined that Paul would have survived in the water three to seven hours after entering the water. (Deposition of Conradi at 5, 13) Paul probably survived longer than Daniel and Bobby Lee. (Deposition of Conradi at 15, 35–36)[23] Dr. Kim Collins, who performed the autopsy on Paul, confirmed

that there was no physical difference, in comparison to Daniel and Bobby Hurd, Jr. that would have caused Paul to die earlier. (Deposition of Collins at 27–28) Dr. Russell A. Harley, a Professor of Pathology and Laboratory Medicine at the Medical University of South Carolina testified that Paul probably died at about the same time as Daniel and Bobby Lee. (Tr. at 274, 282) Paul also died as result of asphyxia due to drowning. Hypothermia was a contributing factor to his death. (Plaintiffs' Exhibit 12)

## I. The Coast Guard Could Not Have Saved Michael Wayne Cornett

35. Michael Wayne Cornett's body was found on January 23, 1998, twenty-six days after the accident. (Plaintiffs' Exhibit 3 at 9) The Coast Guard could not have saved Michael Wayne Cornett's life, considering that he was most likely thrown overboard and drowned when the S/V *Morning Dew* hit the north jetty.

## J. The Coast Guard Could Have Saved Bobby Lee Hurd and Daniel and Paul Cornett

36. The time of death for each boy was between 1000–1100 (10:00—11:00 a.m.) on December 29, 1997.

37. The initial call to the Coast Guard was made at 0627 (6:27 a.m.) and the pilot boat terminated its search at 0648 (6:48 a.m.). The Coast Guard would have located Daniel, Paul, and Bobby Lee within one to two hours after deployment of Coast Guard search boats and helicopters. (Deposition of Dein at 94–96, 151–154, 156–157) A request for a helicopter was made

---

**23.** Individuals who exert themselves by swimming against the current or swimming in cold water tend to lose heat faster than those suspended in the water, such as Paul who was wearing a life vest. (Deposition of Conradi at 13–14) Because Paul was able to float without body movement, it is more likely than not, his body temperature was maintained for a longer period of time than Daniel and Bobby Lee's, who had to struggle in the water. Thus, Paul had a greater chance of remaining warmer and most likely survived longer than Daniel and Bobby Lee. (Deposition of Conradi at 13–14)

at 1128 (11:28 a.m.) and the helicopter discovered the mast of the sunken S/V *Morning Dew* at 1151 (11:51 a.m.). At 1157 (11:57 a.m.) a Coast Guard boat was also underway with an estimated twenty minute transit time. At 1257 (12:57 p.m.) the helicopter discovered Paul's body, and the Coast Guard boat made a recovery at 1303 (1:03 p.m.), within two hours of the 1115 (11:15 a.m.) report. (Plaintiffs' Exhibit 3 at 8–9) As noted above, buoy 22 is less than 1250 yards from where Daniel and Bobby Lee's bodies were found. According to CDR Lee's SAR Case Study of the S/V *Morning Dew* accident, the S/V *Morning Dew* sank at a point which is less than 3000 yards from where Daniel and Bobby Lee were found and approximately 2400 yards from where Paul was found. Thus, recovery of the children on the S/V *Morning Dew* would have easily occurred within two hours of the 0648 call (by 0848 hours [8:48 a.m.]) had a proper deployment been made and had the Coast Guard not terminated the search prior to daylight. Since all three boys were alive until between 1000 and 1100, they all would have been saved.

38. Admiral Peschel testified that the S/V *Morning Dew* was afloat on the north side of the jetty. (Deposition of Peschel, at 98) High tide was at 0731 (7:31 a.m.) and allowed the boat to float across the jetty to the south side. The boat sank at approximately 0900 (9:00 a.m.). (Deposition of Peschel at 99) I find that since the boys could have stayed with the boat until 0900 (9:00 a.m.), they would have been found by the Coast Guard before they ever were forced into the water had the search not been terminated at 0648.

---

24. The Hurds have an older daughter, Holly Lynn Hurd. (Tr. at 353)

### K. The Boys Were Not Negligent

39. The boys did not exacerbate their condition or hinder their rescue. On the contrary, the evidence compels the finding that the boys stayed with the S/V *Morning Dew* as long as possible. Furthermore, they used a life jacket and life ring and apparently all three of them attempted to reach the shoreline after being forced into the water. Their actions relative to their own rescue were reasonable. Each boy exercised that degree of care which a reasonably prudent person would have exercised under the same circumstances.

### L. Damages for the Loss of Bobby Lee Hurd, Jr.

40. Bobby Lee Hurd, Jr., born April 5, 1983, was fourteen years of age at the time of his death. He was the only son of Deirdre Hurd, born May 29, 1964, and Bobby Hurd, Sr., born November 11, 1963.[24]

41. The testimony demonstrates that Bobby Lee was a bright and affectionate child, who spent considerable time with his family. He had the ability to and did enrich the lives of both of his parents. Deirdre and Bobby, Sr. were devoted to their only son and very involved with his life. As the result of Bobby Lee's death, both parents, once happy, outgoing people have led sad and isolated lives. At trial, Bobby, Sr. testified that he and his wife rarely get out of the house anymore.[25] The loss of Bobby Lee has made it difficult for Mr. and Ms. Hurd to be around people and it is extremely difficult for them to see happy people. They have both become withdrawn. Bobby Lee was the center of both parents' lives. Ms. Hurd testified that Bobby Lee was the most loving child in the family. (Tr. at 362) The parents

---

25. Mr. Hurd further testified that the family sold their "dream home" because it felt "empty" without Bobby Lee in it. (Tr. at 359) ("It wasn't home without him being there.")

have a new baby daughter who they consider a blessing in their lives, but the birth of the Hurds' daughter has not filled the void left by the death of their only son and namesake, Bobby Lee. (Tr. at 361)

42. Bobby Lee was in good health and had a normal life expectancy of 56.93 years pursuant to the South Carolina life expectancy tables.

43. As a result of the pre-daybreak suspension of the search and rescue by the Coast Guard, Bobby Lee Hurd, Jr. was forced to be and was adrift in the cold waters of the Atlantic Ocean from the time the boat sank, until his death, which occurred between 1000 hours and 1100 hours. Bobby Lee sustained personal injuries from being stranded on the boat as it was pushed across the jetty by the wind and tide and eventually sank on the inner jetty, and the terror and helplessness he experienced as he was eventually forced into the sea. Moreover, he endured intense emotional distress in being able to see houses and people on nearby Sullivan's Island, see the pilot boat's search light near buoy 22, and see boats going in and out of the Charleston Harbor, while unable to attract attention to himself. During this time his condition became increasingly worse, he endured severe physical and emotional pain and suffering as he was faced with his own impending premature death.

44. At the time of trial, Deirdre Hurd's life expectancy was 42.05 years and Bobby Hurd, Sr.'s life expectancy was 36.78 years pursuant to the South Carolina life expectancy tables.

### M. Damages for the Loss of James Daniel and Michael Paul Cornett

45. James Daniel Cornett, born in May of 1984, was thirteen years of age at the time of his death and Michael Paul Cornett, born in April of 1981, was sixteen years of age at the time of his death.

They were the only children of Libby Cornett, born March 1, 1951.

46. Daniel had a normal life expectancy of 57.86 years pursuant to the South Carolina life expectancy tables. Paul had a normal life expectancy of 55.09 years pursuant to the South Carolina life expectancy tables.

47. The testimony demonstrates that Daniel and Paul Cornett were intelligent and loving children, who enriched the life of Libby Cornett. Libby Cornett spent a tremendous amount of time with them, having chose to home-school both children. (Tr. at 54)

48. The loss of one child is a significant loss, but there is an additional loss when a mother loses both of her children at the same time. The medical testimony reveals that Libby Cornett has suffered severe depression and will, for the rest of her life, continue to suffer depression as a result of the loss of her children.

49. Ms. Cornett's emotional condition was exacerbated by the egregious conduct of Commander Manson Brown when he visited her on the pretense of identifying some items from the S/V *Morning Dew*. (Tr. at 72) After requesting that Ms. Hurd also be present for this meeting, on March 17, 1998, Commander Brown flew to Mountain City, Tennessee, the residence of the Hurd family. (Tr. at 72) When Commander Brown arrived at the Hurd residence, he requested that the children present leave the room, and then pulled out a tape player, requesting that Ms. Cornett identify the voice on the tape that he was going to play. (Tr. at 73) Immediately Ms. Cornett recognized the voice on the tape as her youngest son, Daniel. (Tr. at 73) Daniel was screaming "Mayd ... Mayday, U.S. Coast Guard, come in." (Tr. at 73) Commander Brown informed Ms. Cornett that the call was made around 2:30 a.m. (Tr. at 73) At that moment, Ms. Cornett testified that she realized the length of

time her family had been in the water thinking that someone was going to rescue them. (Tr. at 74) Ms. Cornett testified that she "[k]new basically where they were, and I knew that they could see the lighthouse there on Sullivan's Island, and I knew they could see the lights of Charleston, and I know that they saw how close they were, and I know that they had to have felt they were going to be rescued. It has tormented me, knowing they were out there all those hours. What had they been thinking? Were they afraid? Did they know they were going to die? Not knowing what happened, it's been—it's been torment for us all every passing day." (Tr. at 74)

50. Libby Cornett has been required to seek and obtain medical treatment from psychologists and this treatment is expected to continue for the rest of her life. The cost of her medication is expected to be between $120–$220 per month. Her physician has testified that she will probably be required to take this medicine for the rest of her life. (Second Deposition of Dr. Quinn at 16–17)

51. Ms. Cornett incurred funeral expenses for the burial of Daniel Cornett in the amount of $5,604.00.

52. Paul Cornett's funeral expenses totaled $5,605.52.

53. Additionally, Libby Cornett incurred related expenses for grave markers and grave sites for her two children. The cost for grave markers for Paul and Daniel Cornett totaled $1393.20. The cost for their grave sites totaled $1200.00. (Plaintiff's Exhibit 11)[26]

54. As a result of the pre-daybreak suspension of the search and rescue by the Coast Guard, Daniel and Paul Cornett sustained injuries in that they were forced to be and were adrift in the cold waters of the Atlantic Ocean from the time the boat sank until their deaths, which occurred between 1000 hours and 1100 hours. The boys sustained personal injuries from being stranded on the boat as it was propelled across the jetty by the wind and tide, where it eventually sank on the inner jetty, and the terror and helplessness they experienced as they were eventually forced into the sea. Moreover, they suffered intense emotional distress in being able to see houses and people on nearby Sullivan's Island, see the pilot boat's search light near buoy 22, and see boats going in and out of the Charleston Harbor, while unable to attract attention to themselves. As their conditions became increasingly worse, they endured severe physical and emotional pain and suffering as they were faced with their own impending premature deaths.

55. According to the South Carolina life expectancy tables, Libby Cornett, age 49 at the time of trial, has a life expectancy of 30.39 years.

56. In making the foregoing findings of fact, the Court has taken into consideration all of the evidence presented. The Court, however, finds the credible evidence, considering the appearance and demeanor of the witnesses and the testimony in general, supports all of the above by a preponderance of the evidence.

## V. CONCLUSIONS OF LAW

### A. JURISDICTION

Plaintiffs claim that this case falls within the purview of the Federal Tort Claims

---

**26.** Libby Cornett paid $2400.00 for four grave sites. This court divided the total cost by the number four and multiplied that number by two. This sum reflects the cost of the grave sites for Paul and Daniel. Similarly, Ms. Cornett paid $2089.80 for grave markers for her two children and her husband. This court divided the total cost by the number three and multiplied that sum by the number two. This sum reflects the cost of the markers for Paul and Daniel.

Act ("FTCA"), 28 U.S.C.A. § 1346(b), § 2671 et seq., or in the alternative, liability attaches under 28 U.S.C.A. § 1333, and the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and Public Vessels Act, 46 U.S.C. §§ 781–790. As discussed *infra*, the FTCA does not apply to this case and jurisdiction is grounded in admiralty and general maritime law.

### 1. Federal District Courts Have Exclusive Jurisdiction Over Admiralty and Maritime Cases

This court has subject matter jurisdiction pursuant to Article III, § 2, clause 1 of the United States Constitution and its statutory corollary, 28 U.S.C. § 1333(1). These provisions grant federal district courts exclusive jurisdiction over cases with admiralty or maritime causes of action.

■ A case falls within the admiralty jurisdiction of a federal court when it satisfies a two-prong test. *See Sisson v. Ruby,* 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); *Wright v. United States,* 883 F.Supp. 60, 62 (D.S.C.1994); *In re Bird,* 794 F.Supp. 575, 577 (D.S.C.1992). The first part of the analysis requires the court to determine if the incident which forms the basis of the suit satisfies the locus requirement, meaning the incident must have occurred on navigable waters. *See Wright,* 883 F.Supp. at 62. The court then must determine if the case satisfies the nexus requirement. A case satisfies the nexus requirement when the incident has a substantial relationship to traditional maritime activity and has the potential to disrupt commercial maritime activity. *See id.* (stating that the relevant activity should be judged by the general conduct from which the incident arose, not by the particular circumstances of the incident).

■ There is no dispute in this case that the incident occurred on navigable waters. The S/V *Morning Dew* hit a jetty and sank in the Atlantic Ocean. As to the relationship to traditional maritime activity, the operation of a sailboat can only be characterized as a traditional maritime activity. *See, e.g., Wright,* 883 F.Supp. at 63 (finding that the operation of a pleasure boat on navigable waters constituted a traditional maritime activity). Moreover, the presence of a sinking sailboat and its passengers in the water "clearly poses a hazard to navigation." *See id.* Thus, the presence of the sailboat and its passengers in the water, clearly has the potential to impact maritime commerce. *See, e.g., In Re Bird,* 794 F.Supp. at 581 (finding that the presence of a passenger in the water who had been pushed overboard could potentially affect maritime commerce). Accordingly, this case falls within the admiralty jurisdiction of this court.

### 2. The United States Has Waived Its Sovereign Immunity in Admiralty Cases Pursuant to the Suits in Admiralty Act

■ The United States cannot be sued without a waiver of sovereign immunity. *See Buchanan v. Alexander,* 45 U.S. 20, 4 How. 20, 11 L.Ed. 857 (1846). By virtue of the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, and the Public Vessels Act, 46 U.S.C.A. §§ 781–790, the United States has consented to be sued in admiralty. *See Basic Boats, Inc. v. United States,* 352 F.Supp. 44, 46 (E.D.Va.1972). This waiver of sovereign immunity imposes "liability upon the government where the principles of admiralty law would impose liability on private individuals." *Basic Boats,* 352 F.Supp. at 48. In other words, the liability of the Coast Guard is the same as that of private parties. *See* 46 U.S.C. app. § 743.

### a. The Federal Torts Claim Act Is Inapplicable To the Facts of This Case

■ All admiralty claims to which the United States is a party fall within the ambit of the Suits in Admiralty Act ("SIAA"). *See Kelly v. United States*, 531 F.2d 1144, 1149 (2d Cir.1976).[27] Maritime tort claims that were previously allowed only on the law side of the district courts under the Federal Tort Claims Act ("FTCA") are now brought on the admiralty side of the district courts under the SIAA. *See United States v. United Continental Tuna Corp.*, 425 U.S. 164, 176 n. 14, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976). In other words, if the plaintiff's complaint alleges admiralty claims, "then the SIAA provides their exclusive remedy." *Sawczyk v. The United States Coast Guard*, 499 F.Supp. 1034, 1037 (W.D.N.Y.1980). Thus, tort claims which can be brought against the United States under the SIAA cannot also be brought under the FTCA. *See* 28 U.S.C.A. § 2680 (West 2000) (providing that the Act does not apply to "(d) Any claim for which a remedy is provided by sections 741–752, 781–790 of Title 46, relating to claims or suits in admiralty against the United States."). Since this case clearly falls within the ambit of the SIAA, the FTCA is inapplicable to the facts of this case.

### b. Discretionary Exception to the Waiver of Sovereign Immunity

■ The Discretionary Function Exception to the FTCA claim preserves the United States sovereign immunity against "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the [United States], whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (West 2000). The Suits in Admiralty Act does not contain an analogous exception for the discretionary acts of government employees. However, a majority of federal circuit courts have held the discretionary function to the FTCA is implicit in actions brought under the SIAA. *See, e.g., Wiggins v. United States of America Through the Department of the Navy*, 799 F.2d 962, 966 (5th Cir.1986); *Williams v. United States*, 747 F.2d 700 (11th Cir.1984); *Gemp v. United States*, 684 F.2d 404 (6th Cir.1982); *Estate of Callas v. United States*, 682 F.2d 613 (7th Cir.1982); *Canadian Transport Co. v. United States*, 663 F.2d 1081 (D.C.Cir. 1980); *Bearce v. United States*, 614 F.2d 556 (7th Cir.1980), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *Chute v. United States*, 610 F.2d 7 (1st Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980). Thus, even though the United States waives its sovereign immunity under the SIAA, government immunity under the Act will remain intact when the facts of the case reveal that the government was performing a discretionary function. *See Wiggins*, 799 F.2d at 966.

■ To determine whether a governmental function is discretionary, the court must engage in a two-tier analysis. The exception applies only (1) when the relevant conduct involves an element of judgment or choice on the part of the government actor and (2) when the conduct involves considerations of public policy, i.e., decisions grounded in social, economic and political activity. *See United States v. Gaubert*, 499 U.S. 315, 322, 111

---

**27.** Plaintiffs' Complaint also invoked the Public Vessels Act. Claims falling within the SIAA and the Public Vessels Act proceed in the same manner. *See* 46 U.S.C. app. § 782 (Cases falling within the purview of Public Vessels Act "shall be subject to and proceed in accordance with the provisions" of the Suits in Admiralty Act.)

S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Minns v. United States*, 155 F.3d 445, 451 (4th Cir.1998) (citing 28 U.S.C. § 2680(a)). The first tier of this analysis "[i]s not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directives." *Appley Bros. v. United States*, 7 F.3d 720, 722 (8th Cir.1993) (citing *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). The second prong mandates that a court decide if the "[j]udgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267 (quoting *Berkovitz v. United States*, 486 U.S. at 536, 108 S.Ct. 1954).

### c. The Fourth Circuit Has Held that the Discretionary Function Exception Will Apply In Some Circumstances

The Fourth Circuit recognizes a discretionary function exception to government liability under the SIAA but has held that it applies only in "some circumstances." *See Faust v. South Carolina State Hwy. Dep't*, 721 F.2d 934 938–39 (4th Cir.1983) (retreating from the court's earlier position that the discretionary function exception does not apply to the SIAA); *see also Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir.1991) (reasoning that *Faust* narrowed *Lane* and recognized the existence of a discretionary function exception to the SIAA in "some" circumstances). *But see Lane v. United States* 529 F.2d, 175, 179 (4th Cir.1975) (finding that the SIAA contains no discretionary function). Such circumstances "prevent judicial second-guessing of legislative and administra-

tive decisions grounded in social, economic, and political policy through the medium of an action in tort." *Tiffany*, 931 F.2d at 276 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense, (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). "Were it otherwise, the cumulative force of liability 'would seriously handicap efficient government operations.'" *Tiffany*, 931 F.2d at 276 (quoting *United States v. Muniz*, 374 U.S. 150, 163, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)). For example, when national security interests are implicated, the discretionary function exception will apply. *See, e.g., Tiffany*, 931 F.2d at 277 ("The decisions whether and what circumstances to employ military force are constitutionally reserved for the executive and legislative branches.").

### d. The Coast Guard Will Not Be Held Liable For Making the Decision Whether to Act or Not

■■■ Under the discretionary function exception, the Coast Guard cannot be held liable for making the decision whether to act or not. However, once the Coast Guard exercises discretion and makes a decision to institute a search and rescue operation, and/or render aid to distressed persons, it is obligated to use due care. *See, e.g., Huber v. United States*, 838 F.2d 398, 400–01 (9th Cir.1988). Thus, assuming that the Fourth Circuit would imply a discretionary function exception to Defendants' waiver of sovereign immunity under the SIAA, it would not apply to the facts of this case because this court has found that the Coast Guard exercised its discretion by making the policy decision to render aid in the search and rescue operation, and concomitantly was obligated to exercise reasonable care in the operation.[28] As stated by the Ninth Circuit:

---

28. Plaintiffs' claims are not based upon the exercise or failure to exercise any discretionary function. Rather, their claims are premised on Sass's negligent, reckless, and wanton actions after he made the decision to assist.

The government's conduct at issue here was not the result of a policy decision about allocation of resources, but rather the allegedly negligent execution of a course of action that was already chosen. At the time ... the Coast Guard had already made the policy decision to assist ... This is not a case where the Coast Guard decided to conserve its resources by not assisting ... instead, the Coast Guard decided to aid ... and then allegedly did so in a negligent manner .... Once that choice had been made ..., the Coast Guard became liable for failure, if any to conform to the applicable standard of care in carrying out or failing to carry out its decision.

*Huber,* 838 F.2d at 400–01.

Sass received a distress call and decided to take appropriate action to aid the people in distress. The closest boat to the scene was the pilot boat and Sass decided to use this boat as the Coast Guard response. There is no evidence and no witness who testified to the effect that Sass decided not to render aid when he was notified of the distress call that someone was in the water screaming for help. While Sass had no affirmative legal duty to do so, Sass did, in fact, decide to render aid and assistance. Once Sass made the decision to render aid, his actions were not discretionary because Coast Guard policy specifically prescribes a course of action for him to follow. Moreover, once Sass made the decision to render aid, Sass's decisions were not grounded in social, economic, or political policy. Rather, he merely implemented, under objective criteria, the clear mandates of the Coast Guard. Thus, Sass's actions in undertaking a search and rescue mission in

this case do not fall within the scope of the discretionary function exception to the SIAA.

## B. CHOICE–OF–LAW

 The substantive law governing a defendant's liability in an admiralty action is to be adjudicated under general maritime law, while state law may be used to assess damages. *See Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206, 216, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996). The Supreme Court recently held that where non-seaman are killed in territorial waters of the United States, a party may assert a claim for relief under state law for survival and wrongful death damages. *See Yamaha Motor Corp.,* 516 U.S. at 202, 116 S.Ct. 619 ("[s]tate remedies remain applicable in such cases"). In other words, state law may supplement the measure of damages while maritime law provides the substantive law. Accordingly, state law governs the damages available for the deaths of Plaintiffs' decedents. At issue in this case is whether Tennessee and Virginia law or the law of South Carolina applies to the determination of damages in this case.

### Federal Choice–of–Law Rules Dictate that South Carolina Law Governs Plaintiffs' Remedies in this Case

 This action sounds in admiralty; therefore, federal choice-of-law rules determine the law governing Plaintiffs' claims for damages. *See Calhoun v. Yamaha Motor Corp.,* 216 F.3d 338, 345 (3d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000). Feder-

---

It is unlike *Daley v. United States,* where the Court rejected an argument that a PRECOM (inquiry of harbor masters to learn if boat has been heard of) was a step in a SAR mission, in other words, a discretionary act for which the Coast Guard would not be held liable. *See Daley v. United States,* 499 F.Supp. 1005,

1009 (D.Mass.1980). Rather, Sass's reliance on the pilots to search the area near buoy 22 exceeded the activity involved with a PRECOM, and had gone beyond a discretionary act and into the initiation of an active rescue operation. (Deposition of Dein at 118)

al choice-of-law rules require the court to analyze which state has "the most significant relationship to the incident and the dominant interest in having its law applied." 216 F.3d at 345.[29]

Plaintiffs have asserted claims under the Wrongful Death Act and Survival Statute, arguing that South Carolina law applies to the determination of damages in this case. Defendant contends, however, that this court should apply the law of the states of Virginia and Tennessee to determine liability because Ms. Cornett lives in Virginia and the Hurd family lives in Tennessee. As such, Defendant argues that the States of Virginia and Tennessee have a substantial interest in obtaining compensation for their citizens.[30]

The Supreme Court enumerated federal choice-of-law principles in *Lauritzen v. Larsen. See* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (involving choice of law between the law of the United States and that of Denmark). The *Lauritzen* court reasoned that courts should consider the following factors when making choice of law decisions in the admiralty arena: (1) place of the wrongful act or the "lex loci delicti commissi" (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of a foreign forum; and (7) the law of the forum. *See id.* at 583–91, 73 S.Ct. 921. Since this case is a domestic one, most of the *Lauritzen* factors are not applicable; however, *Lauritzen* does provide guidance on this issue.

The first and third *Lauritzen* factors, (1) place of the wrongful act and (3) allegiance or domicile of the injured, are at issue in this case. The first factor weighs heavily in favor of applying the law of the state of South Carolina to this case. The decedents intentionally traveled to South Carolina where the injuries and deaths occurred. Moreover, the Cornetts purchased the S/V *Morning Dew* in South Carolina and the entire tragic voyage took place in South Carolina. Thus, the place of the accident was not merely fortuitous.

South Carolina clearly has an interest in regulating the activity that occurs in its territorial waters. The State also has a particularly strong interest in maintaining the safety of its waterways to preserve the economic benefit it derives from tourism and other commercial enterprises. Moreover, the Cornetts previously lived in South Carolina and still owned a substantial amount of property in South Carolina at the time of the incident. (Plaintiffs'

---

**29.** The Third Circuit recently dealt with a similar choice-of-law issue. In *Calhoun v. Yamaha Motor Corp.*, a 12–year old Pennsylvania resident died while riding a personal watercraft in the territorial waters of the United States near the hotel where she was staying in Puerto Rico. *See* 216 F.3d 338, 341 (3d Cir.2000). The decedent, as well as her personal representatives, were residents of Pennsylvania. *See id.* The Third Circuit reasoned that both Puerto Rico (as the situs of the injury) and Pennsylvania (as the home state of the deceased and her personal representative) had a significant interest in having their law applied to the litigation. *See id.* at 347. The court found that since the individuals of the estate seeking damages were all Pennsylvania domiciliaries, Pennsylvania had

a strong interest in having its law of compensatory damages applied to the matter. *See id.* (Pennsylvania "has a substantial interest in obtaining compensation for its citizens in order to remedy wrongs that have been committed against such individuals."). While the court found that Pennsylvania law would govern compensatory damages, it found that punitive damages would be governed by the law of Puerto Rico because of Puerto Rico's significant interest in regulating the activity that occurs in its territorial waters. *See id.* at 348.

**30.** Defendant argues that South Carolina does not have any connection to Plaintiffs or their decedents and therefore has no interest in their compensation. (Trial Brief of Defendant at 47)

Exhibit 20) Furthermore, the Coast Guard entity involved, USCG Group Charleston, is located in South Carolina. The sole relationship of the States of Virginia[31] and Tennessee[32] with this litigation is that the boys lived there at the time of their ill-fated voyage, the personal representatives live there, and the decedents' estates are being administered there. Thus, the facts of this case counsel in favor of the application of South Carolina law as to Plaintiffs' damages.[33]

## C. GENERAL MARITIME LAW

General Maritime Law governs in an admiralty action and affords redress for injuries and damages sustained from negligent conduct. *See Sutton v. Earles*, 26

F.3d 903 (9th Cir.1994). It also provides for damages when the actions of the defendant have been both reckless or wanton. *See Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, *cert. denied*, 474 U.S. 846, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985) (*Furka I*). Based on the Findings of Fact *supra*, I conclude that Plaintiffs are entitled to compensation for the injuries as set forth herein.

## 1. Standard of Care

 The Coast Guard's mission allows it to "perform any and all acts necessary to rescue and aid persons and protect and save property." 14 U.S.C. § 88(a)(1). While the Coast Guard is authorized to perform acts necessary to rescue and aid

---

**31.** The Cornetts lived in Hiltons, Virginia. Ms. Cornett still resides there.

**32.** The Hurds reside in Mountain City, Tennessee.

**33.** This court notes that even if Tennessee law governed the Hurds' claim and Virginia law governed Ms. Cornett's claims, the ultimate total damages award would be the same after analyzing the appropriate factors under the law of these states.

The relevant Tennessee statute provides that:

> Where a person's death is caused by the wrongful act, fault, or omission of another, and suit is brought for damages ... the party suing shall, if entitled to damages, have the right to recover for the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received.

Tenn.Code Ann. § 20–5–113 (2000). The Tennessee Supreme Court has interpreted this statute to entitle plaintiffs to both survivorship and wrongful death damages. *See Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 598 (Tenn.1999) (stating that "[s]urvivors of the deceased may recover damages for their losses suffered as a result of the death as well

as damages sustained by the deceased from the time of injury to the time of death"). Thus, plaintiffs are entitled to recover for injuries endured by the decedent from the time of injury to the time of death. *See id.* at 600. These damages "[i]nclude medical expenses, physical and mental pain and suffering, funeral expenses, lost wages, and loss of earning capacity." *Id.* Tennessee law also provides that the plaintiff may recover for the pecuniary value of the deceased's life. *See id.* "Pecuniary value has been judicially defined to include the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry. Pecuniary value also takes into account the decedent's probable living expenses had the decedent lived." *Id.* (citations omitted). Additionally, loss of consortium-type damages are available. *See id.* at 602. These damages include those for loss of benefits such as attention, guidance, care, protection, training, companionship, cooperation, affection, and love. *See id.*

Virginia case law provides that where an injury is inflicted in a sister state, the laws of that state govern as to the extent of the remedy. *See Dowell v. Cox*, 108 Va. 460, 62 S.E. 272, 273 (1908) (citing *Dennis v. Atlantic Coast Line R.R.*, 70 S.C. 254, 49 S.E. 869 (1904); *Nelson's Adm'r v. Chesapeake & Ohio R.R. Co.*, 88 Va. 971, 14 S.E. 838 (1892)).

people, there is no affirmative duty to rescue or provide assistance to those in distress. *See Daley v. United States,* 499 F.Supp. 1005, 1009 (D.Mass.1980). If, however, the Coast Guard undertakes to perform acts necessary to rescue and aid people in distress, as I have found it did in this case, the Coast Guard has a duty to exercise reasonable care. *See generally, United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 199 (1st Cir.1967), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967). Just as a private citizen, the Coast Guard acts as Good Samaritan in maritime search and rescue missions. *See United States v. Devane,* 306 F.2d 182 (5th Cir.1962); *United States v. Gavagan,* 280 F.2d 319 (5th Cir.1960), *cert. denied,* 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961); *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189 (1st Cir.1967), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 52, 19 L.Ed.2d 98; *Patentas v. United States,* 687 F.2d 707 (3d Cir.1982); *DFDS Seacruises (Bahamas) Ltd. v. United States,* 676 F.Supp. 1193 (S.D.Fla.1987). The Coast Guard, however, is not to be held to a higher standard of care than that of a private person. *See Basic Boats,* 352 F.Supp. at 48; *Petition of United States,* 216 F.Supp. 775, 782 (D.Or.1963).

### 2. The Good Samaritan Doctrine

 The case law that has developed over time provides the standard for a maritime Good Samaritan. This standard provides that if one undertakes to perform acts to rescue or aid those in distress, he is subject to liability for reckless or wanton conduct or, for failure to exercise reasonable care (negligence) if he worsens the position of the victim. *See Furka v. Great Lakes Dredge & Dock Co.,* 824 F.2d 330, 332 (4th Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425, 1430 (9th Cir.1985); *Korpi v. United States,* 961 F.Supp. 1335, 1347 (N.D.Cal.

1997), *aff'd,* 145 F.3d 1338, 1998 WL 231207 (1998). Reckless and wanton conduct has been described as gross negligence. Gross negligence is the failure to use even slight care. *See* Martin J. Norris, *The Law of Maritime Personal Injuries* § 9.4 (4th ed.1990). "The wanton and reckless standard aims to encourage the impulse to assist." *Furka,* 824 F.2d at 332. In other words, "the law will not deter rescuers by charging them 'with the consequences of errors of judgment resulting from the excitement and confusion of the moment.'" *Id.* (quoting *Corbin v. City of Philadelphia,* 195 Pa. 461, 45 A. 1070, 1074 (1900)). "A rescue attempt must be considered in the light of the circumstances that faced the rescuers when they acted and not with the wisdom of an 'armchair admiral' after the fact." *Korpi,* 961 F.Supp. at 1347 (citing *Afran Transport Co. v. S/S Transcolorado,* 458 F.2d 164 (5th Cir.1972); *Magnolia Marine Transport v. Frye,* 875 F.Supp. 1216 (E.D.La. 1994)). For there to be reckless and wanton conduct, there must be an ongoing rescue and the reckless conduct must have occurred during the course of the rescue. *See, e.g., Furka I,* 755 F.2d at 1088; *Berg,* 759 F.2d at 1427–30 (loss of life in course of towing a distressed vessel); *Korpi,* 961 F.Supp. at 1345–47 (yacht was lost in course of Coast Guard rescue); *DFDS Seacruises v. United States,* 676 F.Supp. 1193, 1200–01 (S.D.Fla.1987) (damage caused by firefighting efforts of Coast Guard).

 In this case, I have found that the Coast Guard undertook a duty when it made the decision to render aid. (Findings of Fact at ¶ 15) When the Coast Guard made this decision, it had a report of someone yelling for help in the water. The Coast Guard decided to use the pilot boat which was proceeding to the area of buoy 22 as a search asset. The pilot boat

was requested to report back to the Coast Guard and did so, advising of the negative results of the search. The Coast Guard knew at that time that whoever was in the water had not been found. Upon receiving the report, the Coast Guard via Sass, terminated the search. It is clear now, and should have been clear to Sass at that time, that terminating the search before daybreak was the exercise of no care at all to whoever was in the water. Sass's conduct was reckless and wanton and occurred during the course of the rescue efforts in this case. This conduct worsened the precarious position of Plaintiffs' decedents, and Sass's conduct was the proximate cause of the injuries and deaths of Plaintiffs' decedents. (Findings of Fact at ¶¶ 21–26)

The United States Code provides that "[i]n order to render aid to distressed persons, vessels, and aircraft on and under the high seas and on and under the waters over which the United States has jurisdiction ... the Coast Guard may: (a)(1) perform any and all acts necessary to rescue and aid persons and protect and save property." 14 U.S.C. § 88. This section imposes no affirmative duty on the Coast Guard to act. It does not however, limit the form in which aid may be rendered. The United States Coast Guard Addendum to the National Search and Rescue Manual (Plaintiffs' Exhibit 13) establishes policy for Coast Guard use in SAR operations and Section 3.B.5.a. sets forth that the Coast Guard may render aid by using resources belonging to private entities. Based upon Section 3.B.5.a. and 14 U.S.C. § 88, the Coast Guard is permitted to render aid by initiating an immediate Coast Guard response to persons in distress using resources belonging to private entities. In sum,

> the decision to undertake or abandon a rescue is discretionary with the Coast Guard .... [B]ut having undertaken the rescue and engendered reliance thereon,

the obligation [arises] to use reasonable care in carrying out the rescue. And negligence in the operation would create liability if it was the proximate cause of loss or damage where the position of one was worsened in reliance on the undertaking by the Coast Guard.

*Devane*, 306 F.2d at 186. In other words, while the Coast Guard has no affirmative duty to rescue, the Coast Guard must act with due care once it undertakes a search and rescue mission. *See Lacey v. United States*, 98 F.Supp. 219, 220 (D.Mass.1951). "The rationale is that other would-be rescuers will rest on their oars in the expectation that effective aid is being rendered." *Id.* Based on my Findings of Fact, I conclude that the Coast Guard did make a decision to and did perform acts necessary to rescue and render aid to Plaintiffs' decedents and initiated a Coast Guard response to do so, using resources owned by a private party. (Findings of Fact at ¶ 15)

I also conclude that whether or not there has been an attempt to rescue or render aid is a question of fact. *See Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, 1088 (4th Cir.), *cert. denied*, 474 U.S. 846, 106 S.Ct. 136, 88 L.Ed.2d 112 (1985). This court has found as a fact that the Coast Guard did make a decision to render aid and did perform acts necessary to rescue Plaintiffs' decedents, using resources belonging to the Pilots' Association and engendering reliance therein. After the pilot boat reported that it did not find anyone, Sass suspended the search and took no further action. The search should not have been allowed to terminate before first light. Thus, the Coast Guard breached the standard of care applicable to this case as the Coast Guard's actions were reckless and wanton. The Coast Guard's actions also worsened the position of the children by inducing the Pilots' Association to cease their efforts in the belief that the

Coast Guard had the situation in hand. I conclude that the Coast Guard's failure with regard to the S/V *Morning Dew* was a proximate cause of Plaintiffs' decedents' deaths and the damages sustained by Plaintiffs' decedents were a result of the Coast Guard's breach.

### 3. COMPARATIVE NEGLIGENCE

 Since jurisdiction is premised upon admiralty, federal common law governs. As such, the doctrine of comparative negligence applies. *See, e.g., Mullenix v. United States*, 984 F.2d 101, 104 (4th Cir. 1993) (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 407, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)). Therefore, in the context of an admiralty case, damages should "[b]e allocated among the parties proportionately to the comparative degree of their fault." *Reliable Transfer Co., Inc.*, 421 U.S. at 411, 95 S.Ct. 1708. However, a plaintiff's negligence, which may have precipitated the rescue effort, is not relevant to the comparative fault calculation. *See Korpi*, 961 F.Supp. at 1347. Rather, the relative negligence of the person to be rescued is that which relates to the rescue and either worsens the victim's condition or hinders the rescue. *See Berg*, 759 F.2d at 1431; *Korpi*, 961 F.Supp. at 1347. When analyzing a plaintiff's conduct in terms of the rescue effort, the standard to be used is that of a reasonably prudent person under similar circumstances. *See Korpi*, 961 F.Supp. at 1347 (citing *Prosser & Keeton on Torts* § 65, pp. 453–54 (W. Keeton ed. 5th ed.1984); *Mroz v. Dravo Corp.*, 429 F.2d 1156, 1163 (3d Cir.1970); *Almaraz v. Universal Marine Corp.*, 472 F.2d 123, 124 (9th Cir.1972)).

 The children on board the S/V *Morning Dew* did not exacerbate their condition or hinder their rescue. On the contrary, the evidence reflects that the boys stayed with the S/V *Morning Dew* as long as possible. Furthermore, they used a life jacket and life ring and apparently all three of them attempted to reach the nearby shore after the S/V *Morning Dew* sank. Their actions relative to their own rescue were reasonable. Each child exercised that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances.

### D. SOUTH CAROLINA LAW ON WRONGFUL DEATH & SURVIVAL ACTIONS

### 1. WRONGFUL DEATH

The South Carolina Wrongful Death Act provides in pertinent part that "whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages." S.C.Code Ann. § 15–51–10 (Law. Co-op.2000). "In a wrongful death case, the issue of damages is not directed toward the value of human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death." *Welch v. Epstein*, 342 S.C. 279, 536 S.E.2d 408, 421 (S.C.App.2000) (citing *Zorn v. Crawford*, 252 S.C. 127, 165 S.E.2d 640 (S.C.1969); *Self v. Goodrich*, 300 S.C. 349, 387 S.E.2d 713 (S.C.App. 1989)).

 South Carolina law provides that parents are entitled to a presumption of nonpecuniary damages. *See Mock v. Atlantic Coast Line R.R. Co.*, 227 S.C. 245, 87 S.E.2d 830, 836 (1955); *Self v. Goodrich*, 300 S.C. 349, 387 S.E.2d 713, 714–15 (S.C.App.1989); *see also* F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 615 (2d ed. 1997) ("It may often be assumed that grief and sorrow will be experienced at the loss of a loved one; however, the strength of such presumption

is a function of the closeness of the relationship ....") Damages for wrongful death under South Carolina law include: "(1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship and (6) deprivation of the use and comfort of the intestate's society, the loss of his experience, knowledge and judgment in managing the affairs of himself and his beneficiaries." F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 610 (2d ed.1997) (citing *Mishoe v. Atlantic Coast Line R.R.,* 186 S.C. 402, 197 S.E. 97 (1938)). By statute, South Carolina law also provides that plaintiffs may recover funeral expenses in a wrongful death action or under a survival right of action. *See* S.C.Code Ann. § 15–5–100 (Law. Co-op. 2000) (providing that parties may recover funeral expenses in either the wrongful death action or the survival action, but not both); *see also Adams v. Hunter,* 343 F.Supp. 1284 (D.S.C.1972); *Gomillion v. Forsythe,* 218 S.C. 211, 62 S.E.2d 297, 303 (1950) ("[W]here such expenses are paid by the beneficiary they are a proper element of damages.").

## 2. SURVIVAL ACTIONS

█ Under the Survival Statute, causes of action relating to "any and all injuries to the person or to the personal property" shall survive to the personal representative of the decedent. S.C.Code Ann. § 15–5–90 (Law.Co-op.2000). "The general rule [is] that any cause of action which could have been brought by the deceased in his lifetime survives to his representative under the Survival Act."

*Layne v. Int'l Bd. of Elec. Workers,* 271 S.C. 346, 247 S.E.2d 346, 349 (1978) (citing *Gowan v. Thomas,* 237 S.C. 223, 116 S.E.2d 761 (1960)). A court may award damages in a survival action for conscious pain, suffering and, mental distress of the deceased and also for the deceased's medical, surgical, and hospital bills. *See Welch v. Epstein,* 342 S.C. 279, 536 S.E.2d 408, 421 (S.C.App.2000).

## VI. DAMAGES

The record reflects that the relationships these children shared with their families were exceptional. Daniel and Paul Cornett and Bobby Lee Hurd enjoyed spending time with their families and considered their parents and siblings to be their best friends. The testimony at trial revealed that being a family and sharing time together were the most important aspects of both the Hurds' and the Cornetts' lives. As a result of the closeness shared between these parents and their children, the impact of this tragedy is even more severe. Testimony at trial revealed that these parents have been overcome with grief. The pain they endure on a daily basis is overwhelming, and the damages they sustained are immeasurable. As stated by the South Carolina Court of Appeals in *Scott v. Porter,* "[t]here is no mathematical formula which can easily establish the value of this kind of loss, and it is not this court's place to do so." 340 S.C. 158, 530 S.E.2d 389, 395 (S.C.App.2000). However, in light of wrongful death verdicts in South Carolina involving minor children, the court finds that the following damages are appropriate in this case.[34]

**34.** The Fourth Circuit affirmed an award of Six Million Dollars for the death of a seventeen-year old boy in *Steinke v. Player & Beach Bungee, Inc.,* Nos. 97–1625, 97–173, 145 F.3d 1325, 1998 WL 230828 (4th Cir. May 11, 1998) (unpublished opinion). Similarly, here in Charleston, a jury awarded $12.5 million for the death of a six-year old child, which was later reduced by Judge Hawkins to $9 million. *See Jimenez v. Chrysler Corp.,* 74 F.Supp.2d 548, 575, 578 (D.S.C.1999). It is impossible for this court to distinguish the grief, pain, and sorrow sustained by the Hurds and Mrs. Cornett from that of the Steinke and Jimenez families.

## A. Wrongful Death Damages

### (1) Pecuniary Loss

 Ms. Cornett is required to take anti-depressant medication at a cost of approximately One Hundred Twenty Dollars and No/100ths ($120.00) Dollars per month for life (30.39 years). During the course of her lifetime, she is expected to spend at least $43,761.69 on this medication.[35] Furthermore, she has incurred funeral expenses totaling $13,802.20 for Paul and Daniel.[36]

### (2) Nonpecuniary Loss

With respect to the intangible damages, there is ample evidence that the loss of her family has completely devastated Ms. Cornett. Her mental shock and suffering is severe due to her knowledge of the intense physical and mental anguish her children suffered in the hours before their deaths and by Commander Brown's duplicitous conduct at the Hurd's home when he played the 0218 (2:18 a.m.) tape of Daniel's Mayday call. Because of CDR Brown's actions, the last words that Ms. Cornett heard her son Daniel say were not, "I love you, Mom," as he left on his sailing adventure with his brother and father on December 27, 1997, but "Mayd ... Mayday, U.S. Coast Guard, come in." It is patently obvious from witnessing Ms. Cornett at the trial of this case that these words will haunt her all the days of her life.

As evidence by Ms. Cornett's testimony at trial, the overwhelming magnitude of Ms. Cornett's suffering, sorrow, pain, emptiness and grief is unbearable. Ms. Cornett's loss is amplified by the fact that she home-schooled her children and spent more time with her children than the average parent. The untimely deaths of her beloved children have essentially left her lifeless. Libby Cornett's loss for each decedent is Six Million ($6,000,000.00) Dollars.

With respect to the Hurds' loss of intangibles, the record reflects these parents have suffered the most tragic of all losses, the loss of a child. Not only did Bobby and Deirdre Hurd lose their only son and namesake, but they must live with the knowledge that their son undoubtedly suffered severe emotional and physical pain in the hours before his death. Both parents must endure their own separate loss, and a combined loss as well. The loss of Bobby Lee, Jr. individually within the framework of the distinctive facts presented is Six Million ($6,000,000.00) Dollars, to be divided Three Million ($3,000,000.00) Dollars to each parent.

## B. Survival Action Damages

 Bobby Lee Hurd and Michael Paul and James Daniel Cornett undeniably were terrified by being stranded on a sailboat as it gradually and eventually sank on the inner jetty. This terror had to be exacerbated by their eventual realization that they were alone on the S/V *Morning Dew*, and they each had to have comprehended that their beloved father and uncle had fallen overboard and drowned sometime during the night. Their physical struggles to save themselves were also remarkable. As noted above, Daniel and Bobby Lee were found on the beach of nearby Sullivan's Island. As the boys were forced into the ocean, they not only had to overcome the wind, waves, and

---

**35.** The cost of her medication is expected to be between $120–$220 per month. Her physician has testified that she will probably be required to take this medicine for the rest of her life. (Second Deposition of Dr. Quinn at 16–17) This court calculated her damages using the lowest figure given by her physician. (Findings of Fact at ¶ 50)

**36.** Plaintiffs did not present comparable data on Bobby Lee Hurd.

frigid ocean water, but were swimming against an outgoing tide.

All three children endured severe emotional distress in seeing the lights of passing boats, their proximity to Sullivan's Island, and the fading hope of a rescue, all the while being slowly forced into the cold waters of the Atlantic Ocean with little clothing and life saving equipment. Their physical and mental torture was severe. Accordingly, this court finds that the sum of Three Hundred Thousand ($300,000.00) Dollars is appropriate in light of the severity of their conscious pain and suffering prior to their deaths.

## C. PREJUDGMENT INTEREST

 Pursuant to 46 U.S.C. app. § 743, Plaintiffs may recover costs and interest at the rate of four percent per annum from the date of filing of this action until the judgment is satisfied. The Hurds and Ms. Cornett are entitled to interest at the rate of four percent per year from January 27, 1999, the date these actions were filed.

## VII. CONCLUSION

This tragedy was avoidable. It was not an angry sea or cruel weather that impeded the Coast Guard's ability to rescue the S/V *Morning Dew's* passengers. It was human error, the impetuous termination of a search and rescue mission approximately thirty minutes before sunrise.

This court's decision is not premised on hindsight, rather it based on the circumstances facing the Coast Guard at 6:27 a.m. on December 29, 1997. The Charleston Group's communications with the Pilots' Association initiated a search and rescue mission that the Coast Guard clearly failed to execute properly. The Pilots' Association reasonably expected the Coast Guard to send a boat and helicopter to look for the persons whose screams had engendered the pilot boat's search near and around buoy 22 in the Charleston Har-

bor. As a result of the Coast Guard's reckless suspension of the search for the passengers of the S/V *Morning Dew,* these children suffered horrific deaths in the cold waters of the Atlantic Ocean.

## VIII. JUDGMENTS

### A. CIVIL ACTION NO. 2:99–0240–18

**IT IS ORDERED** that judgment be and the same is hereby entered for DEIRDRE LYNN HURD AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BOBBY LEE HURD, JR., DECEASED, against Defendant, under the Survival Action in this matter, in the sum of Three Hundred Thousand and No/100ths ($300,-000.00) Dollars.

**IT IS FURTHER ORDERED**, that judgment be and the same is hereby entered for DEIRDRE LYNN HURD, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BOBBY LEE HURD, JR., DECEASED, against Defendant for Wrongful Death Act, in the sum of Six Million and No/100ths ($6,000,000.00) Dollars.

**IT IS ALSO ORDERED** that these judgments shall bear interest at the rate of four percent per annum from the January 27, 1999 filing date until said judgments are satisfied and thereafter at the rate provided by law.

### B. CIVIL ACTION NOS. 2:99–0241–18 & 2:99–0243–18

**IT IS ORDERED,** that judgment be and the same is hereby entered for MARY E. MOORE CORNETT, AS PERSONAL REPRESENTATIVE OR THE ESTATE OF MICHAEL PAUL CORNETT, DECEASED, against Defendant, under the Survival Action in this matter, in the sum of Three Hundred Thousand and No/100ths ($300,000.00) Dollars.

IT IS FURTHER ORDERED, that judgment be and the same is hereby entered for MARY E. MOORE CORNETT, AS PERSONAL REPRESENTATIVE OR THE ESTATE OF MICHAEL PAUL CORNETT, DECEASED, against Defendant for Wrongful Death, in the sum of Six Million and No/100ths ($6,000,000.00) Dollars.

IT IS ORDERED, that judgment be and the same is hereby entered for MARY E. MOORE CORNETT, AS PERSONAL REPRESENTATIVE OR THE ESTATE OF JAMES DANIEL CORNETT, DECEASED, against Defendant, under Survival Action in this matter, in the amount of Three Hundred Thousand and No/100ths ($300,000.00) Dollars;

IT IS FURTHER ORDERED, that judgment be entered for MARY E. MOORE CORNETT, AS PERSONAL REPRESENTATIVE OR THE ESTATE OF JAMES DANIEL CORNETT, DECEASED, against Defendant for Wrongful Death, in the sum of Six Million and No/100ths ($6,000,000.00) Dollars.

IT IS FURTHER ORDERED, that judgment be entered for MARY E. MOORE CORNETT, against Defendant in the amount of Fifty–Seven Thousand, Five Hundred Sixty–Three and 89/100ths ($57,563.89) Dollars for her pecuniary Loss.

IT IS ALSO ORDERED that these judgments, exclusive of those awarded for future loss[37] shall bear interest at the rate of four percent per annum from the January 27, 1999 filing date until the date of this order and thereafter at the rate provided by law.

C. CIVIL ACTION NO. 2:99–0242–18

IT IS ORDERED, that judgment be entered for the UNITED STATES OF AMERICA in Mary E. Moore Cornett, as Personal Representative of the Estate of Michael Wayne Cornett, deceased v. United States of America.

AND IT IS SO ORDERED.

---

37. Ms. Cornett is not entitled to prejudgment interest on the future cost of her medication, which totals $43,761.69.